Application of **LARRY BUFFALO CHIEF**, for a Writ of Habeas Corpus,

v.

**STATE OF SOUTH DAKOTA and Don R. Erickson, Warden, Appellants.**

No. 19786.

United States Court of Appeals, Eighth Circuit.

April 30, 1970.

Rehearing Denied June 3, 1970.

---

* Hon. James A. von der Heydt, United States District Court Judge, Anchorage, Alaska, sitting by designation.

R. James Zieser, Asst. Atty. Gen., State of South Dakota, Pierre, S. D., for appellants; Gordon Mydland, Atty. Gen., State of South Dakota, on the brief.

Clinton G. Richards, of Hayes & Richards, Deadwood, S. D., on brief, for appellee.

Before MATTHES, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

The State of South Dakota appeals from an order of the United States District Court for South Dakota, the Honorable Fred J. Nichol, granting Larry Buffalo Chief's petition for writ of ha-

beas corpus.[1] Judge Nichol ordered Buffalo Chief released from the State Penitentiary at Sioux Falls, South Dakota within 90 days of the court's order or within 90 days of an affirmance of the order on appeal, unless a new trial is awarded to the petitioner in the South Dakota Circuit Court within the allotted time.

This case presents serious questions of state-federal relationships, of federal review of state convictions, and of the extent of the assistance of counsel guarantee under the Sixth Amendment to the United States Constitution.

The petitioner, Larry Buffalo Chief, hereafter referred to as "petitioner" or "Buffalo Chief", was originally tried with a co-defendant, Leon Gayton, to a jury in the South Dakota Circuit Court in Deadwood, South Dakota, on April 4–13, 1966, for the murder of C. F. Thorn. Petitioner was found guilty of manslaughter in the first degree and sentenced to 25 years in the South Dakota State Prison. On appeal to the South Dakota Supreme Court the conviction was affirmed, 155 N.W.2d 914 (1968).

The petitioner then, without utilizing South Dakota post-conviction procedure, filed his habeas corpus proceeding in the United States District Court. The District Court after hearing the formal testimony of the petitioner [2] and the testimony of petitioner's attorney for the state trial, Ramon Roubideaux, and after receiving the state record and related exhibits into evidence, found the petitioner was deprived of his right to the effective assistance of counsel granted by the Sixth Amendment because Roubideaux in representing two co-defendants failed to take advantage of some apparently favorable testimony by a state witness, Harry Osborne. The testimony in question was considered as exculpatory of Buffalo Chief but inculpatory of his co-defendant Gayton.

The District Court further held that the state post-conviction remedies were not applicable because the precise question petitioner relies on here had been presented to the Supreme Court of South Dakota, citing for its conclusion, Coleman v. Maxwell, 351 F.2d 285, 286 (6th Cir. 1965), which held in effect that the exhaustion of remedies doctrine did not require repeated attempts for a post-conviction remedy if the issue had been presented to the highest state court.

The District Court's substantive ruling was based on the conclusions that the possibility of harm from counsel's conflict of interest was sufficient to render the conviction invalid, citing Sawyer v. Brough, 358 F.2d 70, 73 (4th Cir. 1966), that the degree of prejudice incurred in a denial of effective assistance of counsel was not a factor in assessing that right, citing Glasser v. United States, 315 U.S. 60, 75–76, 62 S.Ct. 457, 86 L. Ed. 680 (1942), and that the fact both defendants personally retained the same counsel did not preclude them from a later claim of ineffective assistance of counsel arising from a conflict of interest, citing Campbell v. United States, 122 U.S.App.D.C. 143, 352 F.2d 359 (1965).

A fairly detailed recital of the factual situation resulting in the murder charge is necessary for a proper consideration of the constitutional issue involved.

On October 9, 1965 an altercation occurred between some of the occupants of two cars stopped in an alley back of the Harney Hotel in Rapid City, South Dakota. The petitioner and three other Indian men and an Indian woman were sitting in or standing near a Pontiac sedan temporarily parked in the alley. Another car carrying three men and two women, all of whom were white, pulled into the alley behind the Indians' car, and the driver, Charles Johnson, who was looking for a place to park, requested or demanded the Indians move their car. Receiving no response, Johnson got out of his car and walked over to the Indians'

---

1. Judge Nichol's memorandum opinion is reported in 297 F.Supp. 687 (1969).

2. Petitioner assumed the witness stand for the limited purpose of identification.

car. After a few words a fight broke out between Johnson and one of the Indians, Robert Wright. When this occurred, Mrs. Marjorie Johnson and her brother, C. F. Thorn, got out of Johnson's car. Thorn walked over to the affray with his hands in his pockets and was brutally assaulted by three Indian men. One of them knocked him down and while Thorn was trying to crawl away he was wantonly, viciously and brutally kicked to death.

According to the testimony of Mrs. Johnson, after Thorn was on his knees Indians Little, Gayton and Buffalo Chief kicked and stomped Thorn, with Buffalo Chief allegedly delivering the devastating blow which flipped Thorn over causing his head to strike the asphalt.

As is usual in these types of situations, there is considerable conflict in the testimony. One of the eye witnesses at the scene, Mrs. Johnson, testified that Buffalo Chief actively participated in the kicking and stomping of Thorn, and that she personally tried to pull Buffalo Chief away from Thorn, grabbing Buffalo Chief and imploring him not to kill her brother. Another witness, Irma Fast Horse, the Indian woman, placed the blame on Gayton and Buffalo Chief for the fatal assault on Thorn, but the veracity of this testimony is questionable since its effect was to exonerate Dennis Little, the other Indian, who was her lover and the father of her child. At a pretrial hearing Irma Fast Horse tried to protect all the Indians, testifying that none had anything to do with the assault. Irma Fast Horse testified at the trial that the petitioner was fighting with Thorn and that Dennis Little was helping Bobby Wright fight Johnson. She said that Gayton knocked Thorn down and then Gayton and the petitioner kicked Thorn "quite a few times." Her pre-trial testimony was certainly false and her overall credibility was for the jury's determination.

The co-defendant, Gayton, testified that he got pretty drunk in the afternoon and was asleep when the car drove in the alley, and that he woke up shortly after the car stopped. While in the car he looked back and saw Thorn getting out of the car, so he got out. Thorn came toward them with his fist doubled up like he was going to hit Gayton. Instead, Thorn turned around and jumped on Johnson and his adversaries Little and Wright. Gayton then said Wright and Thorn were fighting and Wright knocked Thorn down, kicking him, while Johnson was fighting Little. He admitted that Thorn was on the ground at that time and said Little was kicking Thorn in the face and on the head. He further testified that the petitioner wasn't in the fight but was standing over close to them. He attributed Irma Fast Horse's testimony against him to the fact he used to be her boy friend.

Buffalo Chief testified that Johnson was trying to grab Wright and possibly kicked Thorn back down while Little was hitting Johnson, and later Little started kicking Thorn while Wright was trying to get away from Johnson. He said Gayton must have been asleep in the car because he didn't see him until later. Buffalo Chief also testified he tried to break up the fight between Johnson and Wright. Gayton later appeared and attempted to separate Little and Thorn. Buffalo Chief denied striking or kicking anyone and said he saw Little and Wright kicking Thorn.

All of the witnesses except the defendants are in substantial agreement that Charles Johnson was fighting with Wright during the entire period that Thorn was being assaulted, and that Wright was fully engaged with Johnson and did not participate in the assault on Thorn. Although Mrs. Johnson testified there were five male Indians involved in the fight, the other witnesses saw only four, and a reading of the record shows that in all probability only four male Indians were involved. Gayton and Buffalo Chief admitted being at the scene but denied taking part in the fight, placing full blame on the other male Indians.

Three of the Indians, Little, Gayton, and Buffalo Chief, were separately charged with the murder of Thorn.

Counsel was appointed for Buffalo Chief, and Gayton and Little employed Ramon Roubideaux, an experienced and able attorney with an extensive criminal practice.[3] Buffalo Chief then dismissed his court appointed counsel and also employed Roubideaux. Pleas were then entered by these defendants of not guilty and not guilty by reason of insanity, the latter plea being withdrawn before trial. Gayton and Buffalo Chief through their counsel Roubideaux asked that their cases be consolidated for trial. The trial judge examined them in some detail on the motion to consolidate and asked each of the defendants personally if they desired to have the cases consolidated for trial which they assured the Court they did. The Court allowed the consolidation and also authorized a requested psychiatric examination for Buffalo Chief. After a change of venue requested by the defendants was granted, the case was sent to and tried at Deadwood, South Dakota.

The sole basis upon which this § 2254 habeas corpus proceeding is pressed in the federal court relates to the testimony of a government witness, Harry Osborne, who was a disinterested bystander.

Osborne testified that while walking from Collins Mobil Gas Station, he had occasion to pass the alley behind the Harney Hotel when he noticed a fight going on in the alley. He testified "at least three men" assaulted Thorn.

Osborne did not know any of the participants except Wright, who was fighting with Johnson. Osborne positioned this portion of the fight off to the side of the alley, while the assault on Thorn was taking place at the front of the alley (beside the Indians' car). Osborne did not know the other participants and was unable to recognize their faces, but he could describe some of their clothes. According to his testimony, he was "about 100 feet maybe more" away from the scene and his visual description was as follows:

"A. There was one large fellow, he was wearing a white shirt with dark pants, he mostly had his back to us, and there was one smaller fellow that was right next to him almost in front of the car, was wearing short sleeved shirt; then there was another one, he had a light colored shirt, I wouldn't be able to say for sure whether it was totally white or not.

"Q. What was the guy down on the ground wearing?

"A. Khakis."

Osborne stood up well under intensive cross-examination stating three fellows were fighting with the victim Thorn, there was another fellow who was also wearing a white shirt who was in and out of the headlights of the car, that the "little fellow" wore a short sleeved shirt, that the "big fellow" wore a pure white shirt, and that all of the attacking Indians were swinging and kicking the victim. He again reiterated on cross-examination:

"Like I told you the little fellow with the short sleeved shirt, big fellow with white shirt, and another fellow sort of behind the guy with the white shirt I say had on a light colored shirt, but what color I couldn't tell you."

Osborne didn't know the names of the Indians attacking Thorn but knew Wright was not one of them. Since previous evidence had shown that Buffalo Chief was wearing a dark colored long sleeved jacket, Buffalo Chief contends Osborne's testimony, if brought to the jury's attention, would have exonerated him.

All witnesses appear to be in agreement that Buffalo Chief was wearing a jacket during the entire time the fight was going on. Buffalo Chief testified, "It's a winter jacket, * * * [k]ind of a dark brown," and underneath the jacket was "a light colored shirt." It developed on cross-examination that the jacket Buffalo Chief was wearing had a white lining and was unbuttoned.

---

3. Little subsequently secured different counsel for his separate trial.

Undoubtedly the testimony of Osborne was damaging to the defense of both of the defendants since Osborne observed three Indians assaulting Thorn, which by process of elimination would almost certainly implicate Buffalo Chief and Gayton. Thus, Roubideaux argued that because of the poor light and some obstacles between Osborne and the men fighting Thorn, Osborne was mistaken in seeing three people attacking Thorn. If this part of Osborne's testimony is correct, and there is no reason to view it otherwise, and if we give credence to the well established fact that Wright was busily engaged with Johnson during the period of the aggression, then one of the three men who attacked Thorn had to be Buffalo Chief. On the other hand the basis for the conflict of interest charge against Roubideaux is that he failed to exploit Osborne's testimony that the three Indians attacking Thorn had on either white or light colored shirts. Such testimony, Buffalo Chief alleges, would have eliminated him from participation in the assault, since previous testimony indicated he was wearing a dark colored jacket.

The trial tactic undertaken by the defendants Gayton and Buffalo Chief to exculpate each other and lay the entire blame on Wright and Little was not successful before the jury. Realizing this, Buffalo Chief claimed on his state appeal that the cases should not have been consolidated since "[t]wo such identical defenses to the jury is bound to give the idea that one of them at least is fabricated." This leads us into the context of the case as it was presented to the South Dakota Supreme Court.

The South Dakota Supreme Court, in a unanimous decision reported at 155 N.W.2d 914 (1968) in an opinion authored by Judge Biegelmeier, noted there were 12 assignments of error which presented basically five questions. One of these assignments of error was that Buffalo Chief was denied effective assistance of counsel by consolidation of his case with Gayton for trial. After reviewing the conflict of interest issue in relation to the propriety of the consolidation and the effect of the identical defenses, the South Dakota Supreme Court said at 917:

"Their stories did not implicate—they supported each other and if they gave appearance of being fabricated they cannot complain. The decision to testify in either separate actions or a joint action was their own and their version was susceptible to the same comment in either event. The fact one attorney represents two defendants charged with participation in the same crime is not *ipso facto* evidence of inadequate representation. Curry v. State, 36 Wis.2d 225, 152 N.W.2d 906, and the record does not indicate any such result."

The South Dakota Court went on to review the rather extensive pretrial proceedings and to note at 918 that the trial judge "in detail informed defendants of the motion [to consolidate] and questioned them as to their desire and they separately stated they wanted their cases to be tried as one case." The Court then noted it had recently held in State ex rel. Pekarek v. Erickson, S.D., 155 N.W.2d 313 (1957) that it was not the responsibility of the trial court to exercise any control over the selection of counsel for the accused, nor could the Court determine "what tactics that counsel shall observe within the rules of procedure and evidence and maintenance of decorum." 155 N.W.2d at 918. Under the circumstances the trial court could not refuse to permit the defendants to employ an attorney of their own choice. This part of the decision of the South Dakota Supreme Court appears to be correct and is not challenged in this proceeding. The opinion had comments about defense counsel Roubideaux to the effect that "the brief resume of his many defense motions indicates diligence and it is within this court's knowledge from its records that he has appeared and tried numerous criminal actions throughout the state." *Id.* at

918. Under these circumstances the South Dakota Court did not think the defendant was deprived of effective assistance of counsel because of the consolidation.

It thus appears that the issue placed before the South Dakota court on deprivation of effective assistance of counsel was presented in a different context than is the collateral attack filed in the federal proceeding. The federal proceeding presents the question of whether a conflict of interest in Roubideaux's representation of Gayton and Buffalo Chief occurred after the case had commenced and by reason of unanticipated testimony of the eye witness Osborne. This presents a difficult question that we think should be viewed as follows: (1) if Osborne's testimony could reasonably be considered to be consistent with Buffalo Chief's appearing in a light colored shirt and an unbuttoned dark jacket with a white lining, there is actually no substantial conflict in the evidence on this point and there would be no basis for a conflict of interest charge; (2) if, on the other hand, Osborne's testimony is found to be inconsistent with Buffalo Chief's participation in the crime and Roubideaux failed to inquire into this line of testimony, but instead deprecated it because he was trying to save Gayton at the expense of his other client, Buffalo Chief, a real conflict of interest would be present and Buffalo Chief would not have been afforded the type of representation that any lawyer is obligated to render his client.

We do not think a fair resolution of these points can be made on the present record. Roubideaux in the federal habeas corpus proceeding testified:

"A. Well, when Mr. Osborne testified, his testimony was to the effect that he observed from an alley, off from where this altercation took place, that he observed some Indian boys in white shirts beating or kicking the deceased.

"At that time it became quite apparent to me that if I persisted in bringing out the fact that Larry Buffalo Chief was wearing a dark jacket, that I would in effect be putting the blame on Leon Gayton, who I was also representing and who was wearing a white shirt.

"So I had to—at that particular point, this is the first time that the conflict of interest arose, and I thought I was unable to at that time effectively represent either one of them. (Continuing after interruption) Because I couldn't cross examine the witness Osborne without casting blame on one or the other. If I were to cross examine the witness so as to leave out Gayton—or Buffalo Chief, because he wasn't wearing a white shirt, I would in effect be admitting that Gayton was one of the persons who did some of the kicking. * * *

\* \* \* \* \* \*

"Q. Was Osborne's testimony pretty damaging?

"A. Certainly, I think it was the whole difference in the trial as far as Buffalo Chief and Gayton were concerned. * * *

\* \* \* \* \* \*

"Q. Why, Mr. Roubideaux, didn't you touch on this description (that the three men kicking the deceased all wore white shirts), as it affected Buffalo Chief, in your argument to the jury?

"A. Because as I have already stated, by placing any undue emphasis upon the witness Osborne's testimony, I would in effect be convicting Gayton in an attempt to acquit Buffalo Chief."

We do not recognize the claimed built-in error occasioned by the requested consolidation of the trials, nor is it an issue on this appeal, and we hesitate to summarily overturn a state court judgment where the evidence on the whole is substantial and convincing. Nevertheless, we are left with the posited conflict of

interest said to have arisen during the course of the trial.

■ We do not think the precise issue here presented of a deprivation of Buffalo Chief's Sixth Amendment right to assistance of counsel has been presented to the South Dakota courts. Under Brown v. Allen, 344 U.S. 443, 447, 73 S.Ct. 397, 402, 97 L.Ed.2d 469 (1953), the landmark case enunciating a broadened federal review of state convictions, the exhaustion of state remedies requirement of § 2254(b) is satisfied when "the same evidence and issues already decided by direct review" in the state courts were presented in the federal habeas corpus petition. Here we do not have the same evidence and the issue was presented in a different context. See Kennedy v. Sigler, 397 F.2d 556 (8th Cir. 1968). This issue should be presented to both the trial and the appellate court of South Dakota as it has been laid before us. Certainly neither the South Dakota trial court nor the South Dakota Supreme Court has had the opportunity to weigh and assess the implications of attorney Roubideaux's testimony. We would like to know the state trial court's evaluation of this alleged conflict of interest issue, in particular the question of whether there was any real conflict of interest raised by the testimony of Osborne on the attire of Thorn's assailants. That trial judge is in a much more favorable position to assess credibility and evaluate the facts than are we.

While Roubideaux in the federal habeas corpus proceeding rather glibly testified to a conflict of interest arising during the trial over Osborne's testimony, he also testified he did not realize the full effect of the testimony and how it hampered him until after the trial was over.[4] This indicates a Monday morning review of trial tactics. Roubideaux further makes the statement that he did not know he could do anything about this alleged conflict.

■ This testimony in accordance with the demands of § 2254(d), and in all fairness to the South Dakota judicial system, should be first presented to that system for consideration. Further, the Supreme Court of South Dakota should not be faulted for not fully considering the minor reference to attorney Roubideaux's failure to exploit Osborne's testimony on behalf of Buffalo Chief when the main thrust of the state appeal was directed to other contentions. Only one-half page of a 43-page brief filed by the petitioner in his state appeal was devoted to an illustration of defense counsel's dereliction in not exploiting Osborne's testimony. The thrust in the state court appeal on this broad issue was directed against the consolidation of the cases and not the alleged conflict arising during the course of the trial. This latter contention is now made the main issue in the federal review without ever having been fully and fairly presented to the South Dakota courts. We do not view Osborne's testimony as necessarily exculpating Buffalo Chief, but we pass no judgment on this matter as we think it should be more fully developed in a state plenary hearing and, therefore, express no opinion on the merits of the alleged conflict of interest. But if Buffalo Chief was deprived of the assistance of counsel required by the Constitution because of Roubideaux's failure to accord Buffalo Chief the unfettered and unhampered representation which he had a right to expect, then a new trial should be granted to Buffalo Chief. The right to the assistance of counsel means knowledgeable counsel

---

4. "Q. Am I correct in saying that the conflict first came dramatically to your attention as a result of the Osborne testimony on cross examination?

"A. [Roubideaux] Let's say that the facts constituting the conflict happened at that time. The full effect of them and the realization of how they had hampered me didn't come until the trial was over."

who is unhampered or unfettered in his professional responsibility to the accused. This right to effective assistance of counsel without conflict of interest is not necessarily waived because a defendant chooses to be represented by the attorney for his co-defendant. Craig v. United States, 217 F.2d 355 (6th Cir. 1954) held that an accused who made an intelligent and intentional choice to be represented by the same attorney as his co-defendant did not waive his right to effective assistance of counsel where the conflict of interest arose, as in the present case, during the trial and was not known before the trial commenced. In *Craig*, as in the present case, the district court found that a conflict of interest on the part of Craig's counsel prevented a proper cross-examination of a material witness whose testimony was given considerable weight by the trial judge.

■ *Craig* recognizes that a conflict of interest on the part of counsel representing both accused and another defendant may be such as to deprive the accused of effective assistance of counsel as defined by Supreme Court decisions, citing Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952), and recognizes that it is immaterial whether such counsel was appointed by the court or selected by the accused in the absence of facts constituting a waiver of right.[5] Also, each case depends on its particular facts and circumstances, including the acts, background and experience of the accused.

In passing we note that the District Court's decision was predicated on broad principles announced in three cases. Sawyer v. Brough, 358 F.2d 70 (4th Cir. 1966) ; Glasser v. United States, 315 U. S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ;

Campbell v. United States, 122 U.S.App. D.C. 143, 352 F.2d 359 (1965).

■ Each case bears analysis in the light of the facts giving rise to the principles discussed. *Sawyer* involved a court appointed attorney for two co-defendants, one of whom admitted guilt and the other of whom denied any connection with the crime whatsoever. There a clear conflict arose from the outset and yet the same attorney was forced upon the accused by the court. This is not an analogous situation. In *Glasser* the trial court, over the objection of the accused, appointed his counsel to represent a co-defendant with the appointing judge having been notified that the interests might be inconsistent. This again is not entirely analogous to the present case. We adhere to the broad statement made in *Glasser* that:

"The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. [Citations omitted] Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting, that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court." 315 U.S. at 76, 62 S.Ct. at 467.

But in the present case the South Dakota court appointed separate counsel for the petitioner, and by his own choice he ended up with the same counsel as that of his co-defendant.

*Campbell* is more nearly in point. There each co-defendant was represented by the same retained attorney and the

---

5. We think, however, that where the accused does knowingly and intelligently select his own counsel, the state cannot be charged with *imposing* ineffective counsel on the accused, and this is a proper factor to consider on the waiver issue.

court found at 360 that the defense of one of the accused was "substantially prejudiced by his sharing counsel with his co-defendant at trial." That court further reasoned at 360 of 352 F.2d:

"When two or more defendants are represented by a single counsel, the District Court has a duty to ascertain whether each defendant has an awareness of the potential risks of that course and nevertheless had knowingly chosen it.

\* \* \* \* \* \*

"Considerations of efficient judicial administration as well as important rights of defendants are served when the trial judge makes the affirmative determination that co-defendants have intelligently chosen to be represented by the same attorney and that their decision was not governed by poverty and lack of information on the availability of assigned counsel."

In *Campbell,* defense counsel admitted that he virtually ignored one of the accused in preference to the other. That court also said it was not setting up a definite rule that each co-defendant must be independently represented in each case, but only that an informed decision should be made by the accused as to his representation.

We can say on this record that there was no warning that any conflict of interest might occur during the trial. If Buffalo Chief was actually deprived of the assistance of counsel as guaranteed by the Sixth Amendment, Roubideaux's derelictions in his representation could not be considered to have been waived by Buffalo Chief, an uneducated Indian lad of some 25 years who could not be expected to possess the sophistication requisite to making a knowing and intelligent waiver of an unforeseen conflict of interest situation that prevented his counsel from asserting every legitimate and reasonable effort in his behalf.

We realize that where a possible conflict of interest is pointed out to an accused and the accused then makes an intelligent and intentional waiver, he cannot later complain. Kaplan v. United States, 375 F.2d 895, 897 (9th Cir. 1967), cert. denied, 389 U.S. 839, 88 S. Ct. 67, 19 L.Ed.2d 103 (1967). As noted in *Kaplan,* "the trial court must be able, and be freely permitted, to rely upon counsel's representations that the possibility of such a conflict does or does not exist." But *Kaplan* is no help in this case since here the alleged conflict arose during the course of the trial. However, the trial court probably had the right to assume that Roubideaux, having been hired by Buffalo Chief after the court had appointed separate counsel for Buffalo Chief, would inform the court if there was a reasonable possibility of any conflict of interest. This is not too great a burden to place upon experienced members of the bar who, being retained should have full and confidential information not available to the court on the nature of the defense that is to be presented by each of multiple clients. This is quite a different situation from the court imposing joint counsel upon the accused.

We also note the State has raised the issue of harmless error, citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, (1967) and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), both of which recognize the doctrine of harmless constitutional error. These cases place the burden on the State to show beyond a reasonable doubt that any constitutional error which occurred was not prejudicial. Furthermore, the opinion in *Glasser, supra,* may limit the applicability of any harmless error rule in a conflict of interest situation. We do not believe we are in a position to assess the harmless error doctrine as it applies to this case since this claim of a conflict of interest has not been presented to the South Dakota courts.

This case is remanded to the District Court with instructions to dismiss without prejudice the habeas corpus proceeding filed by Buffalo Chief for failure to exhaust state remedies.