# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1309

_____

Terry Gale Plunk

*Petitioner - Appellant*

v.

Ray Hobbs

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: January 16, 2013
Filed: July 3, 2013

_____

Before BYE, MELLOY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Terry Gale Plunk, an Arkansas state inmate, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2007 state-court convictions and resulting 72-year sentence for several felony offenses, including two counts of possession with intent to distribute methamphetamine. Plunk's petition rests on allegations that his state trial attorney, Phillip Moon, rendered ineffective assistance

of counsel. Plunk argues that Moon rendered ineffective assistance by, among other things, laboring under an actual conflict of interest caused by his dual representation of Plunk and Plunk's girlfriend, Deborah Devries. The magistrate judge recommended denial of Plunk's habeas petition. The district court adopted the magistrate judge's report in its entirety, dismissed Plunk's petition with prejudice, and granted a certificate of appealability. Plunk appealed. We reverse and remand for an evidentiary hearing on whether Plunk waived the conflict of interest presented by Moon's dual representation of Plunk and Devries.

## I. *Background*

Law enforcement officers received reports that Plunk was in possession of a substantial amount of methamphetamine, so officers began surveillance of Plunk's Arkansas residence. One evening in April 2006, officers followed Plunk as he drove away from the residence. After a dangerous, high-speed chase across state lines, officers arrested Plunk in Branson, Missouri. Early the next morning, officers executed a search warrant at Plunk's residence. Police seized firearms, electronic scales, a scanner, empty plastic storage bags, drug paraphernalia, and ledger sheets. Officers also arrested Devries and discovered three grams of methamphetamine in her purse. Missouri officers searched Plunk's impounded truck and discovered approximately 579 grams of methamphetamine.

Based on the chase and the discovery of the drugs and other items, authorities charged Plunk in Boone County Circuit Court Case No.CR 2006-129-3 ("*Plunk 1*") with the following offenses: (1) possession of methamphetamine with intent to deliver; (2) simultaneous possession of drugs and firearms; (3) being a felon in possession of a firearm; (4) fleeing in a vehicle; (5) three counts of criminal mischief (damage to police vehicles); (6) possession of drug paraphernalia; (7) aggravated assault; (8) possession of marijuana; and (9) being subject to a sentencing enhancement due to a prior drug-related conviction. While still detained in Missouri,

Plunk retained Moon to represent him. Plunk was later extradited to Arkansas, and Moon negotiated his release on a $15,000 bond.

Devries was charged with (1) possession of methamphetamine with intent to distribute; (2) simultaneous possession of drugs and firearms; (3) hindering apprehension or prosecution; (4) possession of drug paraphernalia; and (5) possession of a narcotic drug. Devries eventually posted bond and was released from custody. She was represented by a public defender until Plunk arranged for Moon to enter an appearance on her behalf. Moon thereafter defended both Plunk and Devries.

In August 2006, while out on bond, police arrested Plunk during his attempt to deliver methamphetamine to an undercover police officer. Officers discovered 34.4 grams of methamphetamine in Plunk's socks. In Plunk's car they discovered 338.9 grams of methamphetamine, a glass pipe, digital scales, and plastic baggies. Plunk was subsequently charged in Boone County Circuit Court Case No. CR 2006-213-3 ("*Plunk 2*") with the following: (1) criminal attempt to commit capital murder; (2) possession of methamphetamine (a total of 373.3 grams) with intent to deliver; (3) attempt to deliver methamphetamine; (4) possession of drug paraphernalia; and (5) being subject to sentencing enhancement due to prior convictions.

Thereafter, police discovered that Devries attempted to smuggle Xanax and a cell phone to Plunk while he was incarcerated. Devries was arrested and charged with (1) furnishing prohibited articles and (2) unlawful use of a communication device. The charges were both Class Y felonies, each of which carried a possible life sentence.

Moon and the prosecutor negotiated an agreement in which the state would offer a "package" plea deal to Plunk and Devries in which Devries would get ten years' probation in exchange for Plunk serving a 99-year sentence pursuant to plea of guilty to all of the *Plunk 1* and *Plunk 2* offenses. The state's offer of probation for

Devries was entirely contingent on Plunk's acceptance of the state's offer. Moon presented the plea deal to Plunk, but Plunk rejected it because he refused to plead guilty to attempted capital murder. Devries eventually pleaded guilty to her charges, and the court sentenced her to 120 days' imprisonment and ten years of probation.

Prosecutors first brought to trial the *Plunk 2* charges arising from the events of August 2006. Moon knew that Plunk suffered from lifelong mental impairment exacerbated by a traumatic brain injury. Moon feared that Plunk's mental condition might be deteriorating, so he successfully moved the court for a competency evaluation. That evaluation found, among other things, that Plunk had the capacity to appreciate the criminality of his conduct and the capacity to conform his conduct to the law. Moon accepted the findings of the competency evaluation and did not further investigate or present evidence of Plunk's mental impairment. At the close of the State's case, Moon moved for a directed verdict on all charges. The state trial court granted a directed verdict on the charge of attempted delivery of a controlled substance, but it denied the motion on all other charges. The jury convicted Plunk on the two remaining charges—possession of methamphetamine with intent to deliver and possession of drug paraphernalia. But the jury acquitted Plunk on attempted capital murder, the most serious charge. At that point, Moon explored the prospects for a plea deal with the prosecutor. The prosecutor's initial plea offer was for 90 years' imprisonment. Moon negotiated this down to 72 years, resolving all remaining charges from both cases—*Plunk 2* and *Plunk 1*. Moon and Plunk did not discuss Plunk's prospects for parole eligibility under the deal, but Plunk pleaded guilty to the remaining *Plunk 1* charges. The state trial court accepted the jury's guilty verdict on the *Plunk 2* charges and Plunk's pleas on the *Plunk 1* charges. The court adjudged him guilty and pronounced sentences in accordance with the plea agreement.

In the plea agreement, Plunk waived his right to pursue a direct appeal in state court. Nevertheless, Plunk petitioned the district court for a writ of habeas corpus, arguing that Moon rendered ineffective assistance of counsel. The magistrate judge

recommended denial of Plunk's petition. *Plunk v. Hobbs*, No. 5:08CV00203 SWW-JWC, 2011 WL 6963092 (E.D. Ark. Sept. 20, 2011) (unpublished). The district court adopted the report in its entirety, dismissed Plunk's petition with prejudice, and granted a certificate of appealability. *Plunk v. Hobbs*, No. 5:08CV00203 SWW-JWC, 2012 WL 37369 (E.D. Ark. Jan. 9, 2012) (unpublished). Plunk asks this court to reverse the decision of the district court and grant the writ of habeas corpus.

## II. *Discussion*

On appeal, Plunk argues that Moon rendered ineffective assistance by (1) failing to investigate and present evidence of his mental impairment; (2) laboring under an actual conflict of interest that adversely affected his representation through his attempt to negotiate the "package" plea deal; (3) failing to advise him regarding his parole eligibility under the plea deal ultimately reached; and (4) soliciting Devries's testimony against him. We find merit in Plunk's contention that Moon labored under an actual conflict of interest that adversely affected his representation under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

"Although AEDPA directs our review of state court decisions, we apply our usual standards of review to the decision of the District Court, reviewing factual findings for clear error and questions of law or mixed questions of law and fact de novo." *Johnston v. Luebbers*, 288 F.3d 1048, 1051 (8th Cir. 2002) (citing *Kinder v. Bowersox,* 272 F.3d 532, 538 (8th Cir. 2001)); s*ee also Reagan v. Norris*, 365 F.3d 616, 621 (8th Cir. 2004) (holding that where "there is no state court adjudication of [a] claim, . . . we need not apply the AEDPA's deferential standard of review. We review the district court's factual determinations for clear error and its legal conclusions de novo." (internal citations omitted)). "Findings of fact are clearly erroneous if they are unsupported by substantial evidence, or if the reviewing court is left with the conviction that a mistake has been made." *United States v. Dochterman*, 630 F.2d 652, 653 (8th Cir. 1980) (citations omitted).

-5-

Plunk argues that Moon rendered ineffective assistance by attempting to negotiate the package plea deal before he went to trial. He argues that the package deal resulted in an actual conflict of interest that adversely affected Moon's performance. "[I]f [a] defendant can show that his or her attorney had an actual conflict of interest," then he or she does not have to show prejudice. *Berry v. United States*, 293 F.3d 501, 503 (8th Cir. 2002) (citing *Cuyler*, 446 U.S. at 349–50).

> An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance. The effect must be actual and demonstrable, causing the attorney to choose to engage or not to engage in particular conduct. To make such a showing, the defendant must identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Noe v. United States*, 601 F.3d 784, 790 (8th Cir. 2010) (internal citations and some quotations omitted).

Plunk contends that the prosecutor was willing to agree to probation for Devries only if Plunk would plead guilty and agree to a 99-year sentence. He maintains that Moon's dual representation of himself and Devries resulted in Moon's having divided loyalties from the moment that the prosecutor extended the package plea offer: "[i]t was unquestionably in Ms. Devries's best interests to accept the plea deal, while Mr. Plunk was better served by pressing for a better offer or taking his charges to trial." Plunk argues that a letter that prosecutor Wes Bradford wrote memorialized discussions between Moon and Bradford as to the terms of this deal. The letter Bradford sent to Moon stated, in pertinent part, as follows:

> Re:    *State v. Terry Plunk*; Boone Co. No. CR 2006-129-3; 2006-213-3
>       *State v. Deborah Devries*; Boone Co. No. 2006-99-3

Dear Phillip:

Please treat this letter as confirmation of our discussions in this case as follows:

Pursuant to the negotiated plea of Terry Plunk, the State of Arkansas shall extend an offer of probation to Deborah Devries.

If you have any questions, please feel free to contact me.

Bradford further testified under direct examination as follows:

Q. Okay. And when you took over the Plunk cases, were you trying to come to a joint resolution with the Plunk and the Devries cases?

A. Yes. Of course, when the second case came down and both cases were assigned to me, I was looking at it from the standpoint of, if we're going to work out a negotiated plea, it would probably be a wrap-up encompassing both [of Plunk's] cases. But it also turned into kind of a wrap-up, so to speak, in Plunk and Devries's cases. If this offer was accepted, then this offer could be extended. And that was kind of the way it worked.

Q. Okay. And could you say more about that when you say if this offer was accepted? Who would be accepting that offer?

A. If Mr. Plunk accepted an offer that I was authorized to extend to him and he accepted that offer, then there was an offer we were prepared to make to Ms. Devries.

Q. And if you recall, what was the offer to Mr. Plunk?

A. It was, of course, based a lot on the second case. He was charged with attempted capital murder in that case, and the offer that was extended was pleading guilty as charged in both cases and receiving a

sentence of life in prison. If he were to accept that, we were in a position to offer probation to Ms. Devries.

Q.     And so when you say if he were to accept that, you were in a position to extend an offer of probation to Ms. Devries, if Mr. Plunk did not accept that offer, then you could not?

A.     Right. It was contingent, I guess would be a way to describe it, upon Mr. Plunk accepting his offer.

Q.     So Ms. Devries's probation sentence was contingent on Mr. Plunk accepting the life sentence, which included pleaded guilty to all of his charges, including attempted capital murder?

A.     That's correct.

Q.     Let's see. When you were entertaining this joint disposition, did you talk to Phillip Moon about that?

A.     Yes.

Q.     Okay. And I'm going to show you . . . Joint Exhibit 10. Can you see that?

A.     I can.

Q.     Okay. Do you recognize this?

A.     Yes, I do. This is a letter that I would have typed on the 17th of February, 2007, addressed to Mr. Moon regarding plea negotiations that we had entered into regarding the Plunk and Devries cases.

Q.     Okay. So this letter would have come after you'd already talked to Mr. Moon?

A.     Yes. This would have been a follow-up to a verbal conversation that we had.

Q.      Okay. And is the agreement that's discussed here, is that the one that you previously mentioned, that Mr. Plunk would plead to life and Ms. Devries would get probation?

A.      That is correct.

Q.      So is it fair to say that Mr. Moon was amenable to this joint disposition?

A.      I was under the impression that he was at least willing to discuss it with his clients. His personal feelings about it I could not say, but when we discussed it, he certainly seemed willing to at least discuss it with his clients to see if it would be acceptable to them.

Furthermore, prosecutor Chris Carter testified in response to direct examination as follows:

[Q.]   This is Joint Exhibit 5 at page 4. And this is . . . a court appearance in Mr. Plunk's case before Plunk 2 occurred.

* * *

And if you wouldn't mind, if Mr. Moon is the speaker, if you wouldn't mind reading from line 13 to line 21.

A.      "Your Honor, . . . there has been a proposed resolution of this case extended to me by Mr. Carter. At this juncture, our position is to review this offer, but I'd like the Court to put this on the trial docket."

* * *

"We're still going to explore a potential of this, but there's other things involved. The codefendant, who I also represent, your Honor, that we'll need to try to tie all of these in together, and . . . there may be some additional discovery issues that come up. But if the Court would go

ahead and put it on the trial docket and schedule it for trial and we'll try to get this matter re[s]olved prior. If we don't, then we'll be ready to go to trial."

Q.      Do you know what Mr. Moon was referring to when he said you're trying to tie all of these in together?

A.      I don't know what Mr. Moon is referring to. I know he was trying to tie them all together and make a package deal for both of them.

Q.      Okay. Tell me what you mean by that.

A.      Well, when you deal with Phillip and he represents people who are codefendants, he's very big on looking at it and trying to plead them both at the same time on the same day.

Q.      Okay.

A.      That's not the way I necessarily do things, but that's the way he wants it done.

Finally, Plunk testified under direct examination as follows:

Q      Did you ask Phillip Moon to ask the prosecutors to give you a long sentence so that Deb could have probation?

A      No.

Q      Did Phillip Moon ever try to talk to you about a deal like that?

A      No.

Q      He never talked to you about whether or not you—

A      He told me maybe, okay. Sorry. One time he tried to get me to take a 99-year deal and he goes, that would make it better for Deb, she could probably get probation.

Q      Okay. And . . . what did you tell him that you thought about that deal?

A      I told him I ain't going to take it.

Q      Okay. Did Phillip Moon ever tell you that [it] might hurt you to take that long deal?

A      No.

Q      Did he tell you that he was talking to the prosecutors about that deal?

A      No.

Plunk argues that, rather than pursue the 99-year package plea deal,

[i]t was an objectively reasonable strategy for Mr. Moon to seek reduced charges or a reduced sentence for Mr. Plunk from the prosecution or to advise his client to decline a plea offer in which he would fare no better than if he went to trial on both cases, was convicted of all charges, and received the maximum sentence.

"'[A]n actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, . . . it may well . . . preclude[] defense counsel . . . from exploring possible plea negotiations . . . ." *Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978). "[J]oint representation of conflicting interests is inherently suspect, and . . . . counsel's

-11-

conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors." *Mickens*, 535 U.S. at 168 (quoting *Holloway*, 435 U.S. at 490) (third alteration in original).

Plunk cites *Thomas v. State*, 551 S.E.2d 254 (S.C. 2001), to support his claim that Moon labored under an actual conflict of interest from the moment Bradford extended the "package" plea deal. *Thomas* involved a husband and wife who were both indicted for trafficking in more than 200 grams of cocaine. *Id.* at 255. They retained the same attorney. "Counsel testified [at the post-conviction relief hearing that they] both confessed to the crime and waived the potential conflict of interest because they did not want separate attorneys." *Id.* The prosecutor offered the husband and wife a deal: they could each plead guilty to trafficking in more than 100 grams and receive eight-year sentences, or else one could plead guilty to trafficking in the entire amount and the other would go free. *Id.* The husband and wife discussed the plea deal outside of the presence of their attorney. *Id.* The wife decided to plead guilty to the entire amount. *Id.* At the post-conviction relief hearing, the wife testified that

> she did not have her own money to hire a lawyer and she did not understand she could have possibly obtained an appointed lawyer. She stated if she had understood, she would not have used the same lawyer as her husband. [The wife] also indicated she would have gone to trial, rather than plead guilty, if she had understood she was pleading to a 25-year non-parolable sentence.

*Id.* at 255–56. The trial court found that counsel did not have a conflict of interest. *Id.* at 256. The South Carolina Supreme Court reversed, finding that "an actual conflict of interest arose when the solicitor offered a plea bargain that would allow the charge against one spouse to be dismissed if the other spouse would plead guilty to the entire amount of the cocaine." *Id.* at 256. "At the moment the solicitor made the plea offer, petitioner's and Husband's interests became adverse to one another and counsel

-12-

should have advised them accordingly." *Id.* "Although petitioner initially waived a conflict of interest, once it became clear an actual conflict existed due to the plea bargain, counsel should have either withdrawn from representing one or both of them or acquired another waiver covering this specific conflict." *Id.*

Here, the district court found "that counsel's advice to [Plunk] to accept a plea agreement to resolve both his cases and agree on a sentence was not because of his representation of Ms. Devries, but was because of a legitimate concern that the outcome could have been much worse had [Plunk] failed to plead." *Plunk*, 2011 WL 6963092, at *21. The court found that "negotiations [of a package plea deal] did not adversely affect [Plunk's] defense." *Id.* On this record, we disagree. First, the plea deal involved more than merely resolving "both [of Plunk's] cases." *Id.* Rather, it was an attempt "to tie [Plunk and Devries's charges] all together and make a package deal for both of them." Like in *Thomas*, "[a]t the moment [Bradford] made the plea offer, [Plunk's] and [Devries's] interests became adverse to one another and counsel should have advised them accordingly." 551 S.E.2d. at 256. Indeed, it is more likely that Plunk suffered an adverse effect because the record does not indicate that Moon ever advised Plunk of the potential for a conflict of interest from his dual representation. "[A]s opposed to [creating] a mere theoretical division of loyalties," this conflict actually "*affected counsel's performance*." *Mickens*, 535 U.S. at 171. In pursuing the package deal, Moon was prevented "from exploring [other] possible plea negotiations" that would have been more favorable to Plunk. *Holloway*, 435 U.S. at 490.

Moon might have pursued a plea deal to obtain the most favorable outcome for Plunk before going to trial as an objectively reasonable defense strategy, but he did not. *See Noe*, 601 F.3d at 790. Moreover, Moon's "failure to pursue that strategy . . . was linked to" the conflict of interest arising from his dual representation of Plunk and Devries. *See id.* (quotation and citation omitted). Consequently, we find that the

district court erred in concluding that Moon's dual representation was not a "conflict of interest that adversely affect[ed] [Moon's] performance." *See id.*

We also agree with Plunk that the district court's consideration of circumstances surrounding the "plea agreements ultimately reached" after Plunk's trial was immaterial to the question of whether Plunk was adversely affected by Moon's conflict under the *Cuyler* analysis. *Plunk*, 2011 WL 6963092, at *21. The Supreme Court has

> spared the defendant the need of showing probable effect upon the outcome, and ha[s] simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. See [*United States v.*] *Cronic*, [466 U.S. 648] at 658–659 [(1984)], 104 S. Ct. 2039; see also *Geders v. United States*, 425 U.S. 80, 91, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976); *Gideon v. Wainwright*, 372 U.S. 335, 344–345, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). But only in "circumstances of that magnitude" do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict. *Cronic*, *supra*, at 659, n.26, 104 S. Ct. 2039.
>
> [The Court has] held in several cases that "circumstances of that magnitude" may also arise when the defendant's attorney actively represented conflicting interests.

*Mickens*, 535 U.S. at 166; *see also* Wayne R. LaFave, Crim. Proc. § 11.9(d) ("[O]nce a defendant shows that a conflict of interest actually affected the adequacy of his representation, he is automatically entitled to relief; there is no need to establish that the Sixth Amendment violation might have adversely affected the outcome of the case." (quotations omitted)).

-14-

In finding that there was no actual conflict of interest, the district court did not address whether Plunk waived the right to effective assistance of counsel in hiring Moon to represent Devries and himself.

> We have consistently held that the right to effective assistance of counsel may be waived, provided that waiver is knowing, voluntary and intelligent. *See United States v. Bryant*, 766 F.2d 370, 377 (8th Cir. 1985), *cert. denied*, 474 U.S. 1054, 106 S. Ct. 790, 88 L. Ed. 2d 768 (1986); *United States v. Poston*, 727 F.2d 734, 738 (8th Cir.), *cert. denied*, 466 U.S. 962, 104 S. Ct. 2179, 80 L. Ed. 2d 561 (1984); *Larry Buffalo Chief v. State of South Dakota*, 425 F.2d 271, 280 (8th Cir. 1970). Once a valid waiver is found to exist, we need not inquire whether an "actual conflict of interest exists." *Bryant*, 766 F.2d at 378; *see also Larry Buffalo Chief*, 425 F.2d at 280.
>
> * * *
>
> Therefore, a waiver can be valid if obtained during a state trial court proceeding even if the state court does not conduct an on-the-record inquiry, provided that the waiver is knowing, voluntary, and intelligent. *See Larry Buffalo Chief*, 425 F.2d at 280; *accord Harris v. State*, 609 S.W.2d 723, 724 (Mo. App. 1980) (testimony at 27.26 hearing sufficient to determine whether waiver valid); *Davis v. State*, 573 S.W.2d 736, 737 (Mo. App. 1978); *cf. Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 1708, 1717, 64 L. Ed. 2d 333 (1980) ("nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case").

*Henderson v. Smith*, 903 F.2d 534, 536–37 (8th Cir. 1990). "We cannot discern from this record . . . whether, in fact, such a waiver was made. We, therefore, direct the district court to consider this issue at [an] evidentiary hearing" on remand."[1] *United*

---

[1]The record does contain some relevant testimony. For example, Robert Hall is an inmate who assists other inmates with their legal work. Hall helped Plunk to file

his initial habeas petition. Hall testified to statements that Plunk made to him while they were incarcerated together. Hall testified on direct examination as follows:

Q    Mr. Hall, . . . when you said you reviewed Mr. Plunk's papers, . . . you thought that he had some claims to raise?

A    Yes, ma'am.

Q    And what was that?

A    Well, when I found this drug task force report and I asked Terry who she was and I asked him had he ever heard of a conflict of interest and he said no, he didn't know what that was. And I said, Well, it's when two defendants have—when two people have an antagonistic defense. And he didn't know what that was either, and so I said, You sure you never heard your attorney talk about a conflict of interest while y'all were in trial at any time. He says, No, I'm almost positive I've never heard that word. So I sat down and explained to Terry about the conflict of interest.

Terry had told me that he had paid Moon to represent Ms. Devries also. And that Moon, Attorney Moon, had represented both of them on the case. And then I explained, of course, to Terry that he couldn't represent both of them because of what had happened, there was a conflict of interest, and, of course, over and over and over I had to tell him several, several times.

Q    Why did it take so long do you think? Why did you have to tell him several times?

A    He doesn't grasp legal or arguments. He doesn't understand or he didn't understand the significance of everything I was trying to explain to him.

Furthermore, Plunk testified that he met Moon through his son and his son's ex-wife while he was in jail in Missouri. Then, he testified under direct examination as

*States v. Unger*, 665 F.2d 251, 256 (8th Cir. 1981).

### III. *Conclusion*

On this record, we conclude that the district court erred[2] in finding that "negotiations [of a package plea deal] did not adversely affect [Plunk's] defense." *Plunk*, 2011 WL 6963092, at *21. Accordingly, we reverse and remand for further proceedings consistent with this opinion, which shall include an evidentiary hearing on the issue of waiver.

_____

_____

follows:

Q    Did [Devries] ever get a lawyer?

A    I helped her get a lawyer.

Q    Okay. And who was her lawyer?

A    Phillip Moon.

* * *

Q    Okay. And when you hired Phillip Moon for you and Deb, did he say anything to you that it might be a problem for him to represent both of you?

A    No.

Q    And who paid Phillip Moon?

A    Me.

[2]Because of the result we reach as to Plunk's conflict-of-interest argument, we need not address his additional claims of ineffectiveness.