**UNITED STATES of America, Appellee,**

v.

**Henry Paul BRYANT, a/k/a Paul Bryant and Melissa J. Dalton, Appellants.**

**No. 84–1460.**

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1985.

Decided June 28, 1985.

Rehearing Denied Aug. 2, 1985.

Raymond Bruntrager, St. Louis, Mo., for appellant Bryant.

Dempster K. Holland, St. Louis, Mo., for appellant Dalton.

Robert T. Haar, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before HEANEY and ARNOLD, Circuit Judges, and HANSON,* Senior District Judge.

---

* The Hon. William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

ARNOLD, Circuit Judge.

Henry Paul Bryant and Melissa Dalton appeal their convictions on three counts of mail fraud and two counts of wire fraud involving a scheme to bribe Emeric Martin, then Director of the Cervantes Convention Center in St. Louis, for favorable treatment of their convention-booking business, known as Showboard. Appellants raise two substantial issues. First, they argue that the two wire fraud convictions must fall because the government failed to prove that the defendants knew or could reasonably foresee that the telegram in question would be sent interstate. (The telegram was sent from one place in Missouri to another, but, unknown (they say) to defendants, was routed electronically through a Western Union installation in Virginia.) Second, Dalton challenges her wire- and mail-fraud convictions on the ground that these convictions are inconsistent with Martin's conviction for extortion. We find these and the other arguments that appellants raise to be without merit and therefore affirm their convictions.

## I.

The evidence established that the appellants paid Emeric Martin, the Director of the Cervantes Convention Center, over $26,000 during a period from August 1979 to April 1980. In exchange for these payments, appellants received favorable treatment in leasing the Center for expositions and shows.[1]

The Cervantes Convention Center is a municipal convention facility owned by the City of St. Louis. It is governed by the twenty-one member Convention Center Commission and run on a daily basis by the Director. The Commission adopted rules regarding the leasing of the Center which distinguish between commercial and non-commercial shows. Commercial shows are open to the public, often charge admission, and draw their attendance mainly from the St. Louis area; non-commercial shows are sponsored by not-for-profit associations,

most often draw their attendance from beyond St. Louis, and are open only to members of the sponsoring association. The leasing rules prohibited the Director from issuing a lease for a commercial event more than one year prior to the event; however, the Director was permitted to issue a lease for a non-commercial event up to ten years in advance if the expected attendance was not local. If the attendance was local, the lease could be issued only 450 days in advance. To obtain leases over 450 days in advance, the non-commercial customer had to obtain the approval of the Convention and Visitors Bureau, which would then send a bulletin to the Center for issuance of the leases.

The favorable treatment that the appellants received in return for their payments to Martin can conveniently be divided into three different areas: the sports shows; the Industry and Business Expo; and the payment of bills. These are described below.

### The Sports Shows

The sports show at the Center is an annual event normally held in February. Pursuant to an opinion of the Missouri Attorney General, the 1980 sports show was opened to competitive bidding. Bryant and Dalton decided not to bid on the 1980 show, but instead attempted to circumvent the bidding process by locking up the February time block through non-commercial leases. To do so they formed a "not-for-profit" corporation, the "Mid-America Outdoor Sports Association" (MAOSA), and set out to convince the Convention and Visitors Bureau and the Center that MAOSA was a legitimate organization with actual members and that it would be holding a non-commercial event. MAOSA, through its president, Kathryn Mathews, requested leases for its "annual convention and trade show" for five years (1980–1984) during the prime February dates for the commercial sports show.

---

**1.** We view the evidence, as we must on appeal, in the light most favorable to the government.

See *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

After noticing several irregularities about MAOSA's application, M.J. Thirkhill, the manager at the Center, grew suspicious about MAOSA, its relationship to Showboard, and the non-commercial status of its proposed events. Approval of the leases was held up, and Bryant subsequently sent the Center a letter over Mathews's signature complaining about the delay and stating that MAOSA was therefore withdrawing its request for the 1980 dates but would continue to seek leases for 1981 through 1984. Count I of the indictment is based on this letter. Although the letter represented that the Board of Directors of MAOSA had met and that MAOSA had a membership, both Dalton and Bryant conceded that no meeting occurred and that MAOSA had no members.

Thirkhill sent Martin a letter outlining the evidence supporting her suspicions about MAOSA, and Martin then wrote the Missouri Attorney General's Office seeking guidance. That office instructed Martin to inquire into the intentions of MAOSA, and if it appeared to be a commercial promoter, to make MAOSA follow the regulations for commercial events. Martin, who was now receiving payments from Showboard, did not follow this advice. He told Center personnel that Showboard was no longer involved with MAOSA and directed that the leases MAOSA requested for 1981 through 1984 be issued.

The 1981 lease was mailed to Mathews in Kansas City, and this mailing forms the basis for the mail fraud charged in Count II. However, the remaining leases were withheld because of the continuing suspicions of a Center employee. In response to the delay, Mathews, at the direction of Bryant, sent the Center a telegram demanding the 1982, 1983, and 1984 leases. Although MAOSA did not have bylaws, committees, or members, the telegram stated that under its bylaws MAOSA had to report to its committees and membership. This telegram underlies Count IV. Martin then ordered that the remaining leases be sent, and told a Center employee he owed Bryant a favor. By this time, Martin had received over $14,000 from Bryant and Dalton.

In March of 1980, Dalton and Bryant decided to bid on the 1981 sports-show leases to ensure that, either by bidding successfully for the show itself, or by virtue of the MAOSA lease already obtained, they would get control of the time for the 1981 sports show. Accordingly, they submitted five collusive bids under the names of fictitious organizations. Bryant's plan was to withdraw successively each of the highest bids until the bid remaining was just higher than that of a legitimate competitor. After opening the bids the Rental Rates Committee of the Center Commission questioned the ability of several of the high bidders to pay the lease and decided to reject all bids and invite all bidders to submit a second bid with payment secured by a fidelity bond.

In effort to stop the second bidding and prevent another promoter from getting the sports show dates in 1981, Bryant dictated a letter to Mathews which he instructed her to telegraph to the Center over her signature. The telegram, which underlies Count V, threatened to cancel the 1981 MAOSA sports travel and recreational vehicle show, if the Center scheduled another sports show either before or immediately after the MAOSA show.

This stratagem, however, did not stop the second bidding, and Dalton, under the name National Show Producers, was announced the winner with a bid of $85,000. Now, Dalton and Bryant held the dates of February 1–9, 1981, under the name of MAOSA, and the dates of February 10–24, 1981, under the name of National Show Producers. They were now faced with the problem of holding dates for the whole month but having only one show to fill it. To eliminate this overbooking, Dalton appeared at the Center Commission on June 11, 1980, and complained that MAOSA had obtained leases for a commercial event under the guise of producing a noncommercial event. She urged the Commission to cancel the MAOSA leases. The Commission ordered a hearing to clarify this situa-

tion, and subsequently Mathews withdrew MAOSA's claim to the February dates.

### The Industry and Business Expo

In 1980, Showboard helped the Administrative Management Society (AMS), a not-for-profit association of local businessmen, put on its Industry and Business Expo '80. In 1979, Bryant and Dalton were interested in getting contracts for future Expos in 1982, 1984, 1986, 1988, and 1990. However, the Convention and Visitors Bureau refused to issue bulletins for the leases because it believed that the attendance would be primarily local. Despite the Bureau's refusal to send the bulletins, in 1979 Martin ordered a Center employee to issue a contract for the 1982 Expo to Showboard. This lease violated the requirement that a bulletin be obtained for leases more than 450 days in advance and the policy that non-commercial leases should be issued only to not-for-profit organizations, not promoters.

Members of the Convention and Visitors Bureau later discovered that Martin had issued the 1982 Expo lease and decided to back down from their earlier refusal to send the bulletins. Subsequently, they sent the bulletin for 1982 and in addition the bulletins requested for 1984, 1986, 1988, and 1990. After the leases were issued by Martin and signed by Dalton and Martin, they were mailed to the City Comptroller for his signature. This mailing is the basis for Count III.

### Billing Irregularities

The trial evidence indicated that after Martin took over personal supervision of the Showboard account, and after payments to him began, Showboard put on four shows from September 1979 to June 1980 without paying a single bill. This violated the Commission's policy that con-

tracts were not to be issued to any entity that had an outstanding balance at the Center.

In April 1983, a Grand Jury returned a seven-count indictment charging fraud and corruption in the operation of the Center. Dalton and Bryant were charged with three counts of mail fraud and two of wire fraud. Martin was charged with two counts of mail fraud, two of wire fraud, one of extortion, and one of knowingly filing a false tax return. The Court[2] severed the trial of Dalton and Bryant from that of Martin, who was tried first and convicted on all counts.[3] Dalton and Bryant were represented by the same attorney and both convicted on all counts. They now, with separate representation, ask this Court to set aside their convictions.

## II.

Dalton and Bryant argue that their convictions under 18 U.S.C. § 1343 (1982) for wire fraud must be vacated because the government has failed to prove that they knew or could reasonably foresee that the telegrams were being sent interstate. Both of the telegrams at issue were sent from Kansas City, Missouri, to Bridgeton, Missouri, but were routed through Middletown, Virginia.[4]

In response, the United States contends that there is no requirement under § 1343 that the accused know or foresee that the telegram is being sent interstate. The legislative history of § 1343 sheds no light on this question, but we agree with the government that the words of the statute, the general purpose of interstate requirements, and the decisions of other courts support the conclusion that the accused need not know or foresee that the communication was interstate.

We start with the language of Section 1343. It reads as follows:

**2.** The Hon. John F. Nangle, Chief Judge, United States District Judge for the Eastern District of Missouri.

**3.** We affirmed these convictions in *United States v. Martin,* 751 F.2d 258 (8th Cir.1984).

**4.** Appellants do not dispute that these communications are "interstate" within the terms of § 1343. Their argument is that they did not know that Western Union would route the telegrams in question through another State.

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Certainly the statute requires that defendant be a party to some kind of scheme to defraud, a requirement that includes a high degree of *scienter* and moral culpability. It also requires that the defendant intend that a communication by wire be sent in furtherance of the scheme, or at least that the use of wire communication be reasonably foreseeable. But the words themselves, read literally, require only that the wire communication *be* interstate, not that defendants *know* that it is to be interstate. The literal meaning of the statute should control, unless it is contrary to the manifest purpose of Congress or inconsistent with binding case law.

Section 1343 was intended to proscribe the use of certain interstate communication media to perpetrate or facilitate a fraudulent scheme. The requirement of an interstate nexus arises from constitutional limitations on congressional power over intrastate activities under the Commerce Clause. Its inclusion in criminal and civil statutes is most often solely for the purpose of conferring federal jurisdiction rather than of defining substantive elements of an offense. *E.g., United States v. Roselli*, 432 F.2d 879, 891 (9th Cir.1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971) (knowing interstate travel or use of interstate facility not an element under Travel Act, 18 U.S.C. § 1952); *Bibbins v. United States*, 400 F.2d 544, 545 (9th Cir. 1968) (knowledge that automobile crossed state line not necessary for prosecution under 18 U.S.C. § 2312); *United States v. Tyers*, 487 F.2d 828, 830–31 (2d Cir.1973), *cert. denied*, 416 U.S. 971, 94 S.Ct. 1995, 40 L.Ed.2d 560 (1974) (under 18 U.S.C. § 659, defendant need not know that stolen money orders were moving in interstate commerce).

Here, likewise, the requirement seems clearly to be only jurisdictional. The interstate nature of the communication does not make the fraud more culpable. Thus, whether or not a defendant knows or can foresee that a communication is interstate, the offense is still every bit as grave in the moral sense. See *United States v. Blassingame*, 427 F.2d 329, 331 (2d Cir.1970), *cert. denied*, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971) (§ 1343 does not require knowledge or foresight of the interstate nature of communication).

■ The government, however, admits that there is an exception to the general rule that knowledge or foreseeability of the interstate character of the communication is not required under § 1343. The government must show that the accused knew or could have foreseen that a communication in furtherance of a fraudulent scheme was interstate, if the conduct giving rise to the scheme would not be a violation of state law and was not itself morally wrongful. See *United States v. Feola*, 420 U.S. 671, 685, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975). In other words, if what happened was not a violation of state law or wrongful in nature, but is a violation of federal law, an innocent defendant could be ensnared in a federal prosecution if, unknown to him, the communication is in fact interstate.

Indeed, Dalton argues that her conduct was lawful under state law and morally blameless in that she was a victim of the extortion for which Martin was indicted and convicted under federal law. This argument is essentially the same as Dalton's next argument, that her conviction must be reversed because extortion by a payee is a defense to a charge of bribery against the payors, and we reject it for the reasons stated below.

### III.

Dalton argues that her convictions should be reversed because they are inconsistent with Martin's conviction for extortion under 18 U.S.C. § 1951(a), (b)(2) (1982).[5] This inconsistency arises, she contends, because Martin's conviction for extortion logically entails a finding that Dalton was coerced into making the payments and thus negates the finding of specific intent required for fraud.

■ We find this argument untenable for several reasons. First, we have repeatedly held that "inconsistency of a verdict on separate counts of an indictment does not entitle a convicted defendant to reversal of a judgment of conviction." *United States v. Wetzel,* 488 F.2d 153, 155 (8th Cir.1973), quoting *Coil v. United States,* 343 F.2d 573, 576 (8th Cir.), *cert. denied,* 382 U.S. 821, 86 S.Ct. 48, 15 L.Ed.2d 67 (1965); see also *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932).

■ Second, we do not believe that the conviction for extortion entails the conclusion that Martin coerced Dalton into participating in the fraud. Martin was convicted of extortion under § 1951(a), (b)(2) for obtaining the property of another "under color of official right." This language does not require proof of coercion. As the Third Circuit has stated:

> A violation of the statute [18 U.S.C. § 1951(b)(2)] may be made out by showing that a public official through the wrongful use of office obtains property not due him or his office, even though his acts are not accompanied by the use of "force, violence or fear."

*United States v. Jannotti,* 673 F.2d 578, 594 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982),

quoting *United States v. Mazzei,* 521 F.2d 639, 645 (3d Cir.) (en banc), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); see also *United States v. Hedman,* 630 F.2d 1184, 1194–95 n. 4 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

Finally, the evidence does not support Dalton's contention that she was coerced into making the payments. Throughout the trial she and Bryant claimed that the payments they made to Martin were legitimate payments for public-relations services. No suggestion of coercion was raised. Thus, even if there were some inconsistency between the convictions, which there is not, and even if this inconsistency were grounds for reversal, which it is not, the evidence would still fully support Dalton's conviction.

### IV.

■ Dalton and Bryant raise many objections to the admission and exclusion of evidence. We shall briefly discuss those objections which are not wholly insubstantial. First, Dalton and Bryant object to the exclusion of testimony by a former City Counselor that Martin had no legal authority to execute leases on behalf of the City.[6] This testimony was irrelevant and could have confused the jury. The evidence established that as a matter of practice, all leases required the approval of the Convention Director, whether or not this approval was legally required by City ordinance. Since the excluded testimony would not prove that Martin did not in fact exercise control over the Center's leases, it was properly excluded as irrelevant.

■ Dalton and Bryant next object to the District Court's refusal to allow the

---

**5.** Dalton also argues that the District Court erred in not giving an instruction stating that economic coercion may negate the specific intent required for fraud. Dalton did not request such an instruction or object to the Court's instructions on this specific ground. Furthermore, it would not have been appropriate to give this instruction in light of Dalton's own testimony claiming that she freely made the

payments to Martin for his public-relations services.

**6.** They also object to the Court's refusal to give an instruction which stated, in effect, that Martin's signature was not required for Center leases. For the reasons stated below, we also reject this argument.

admission of a video-tape which displays the opening of a show during which Mayor Conway praised Showboard and its work. They claim that this tape was made with Martin's help and that the payments they made to Martin were in part for this service. The appellants, however, failed to lay any foundation by any people involved in the making of this commercial to substantiate Martin's involvement. Also, admission of the film itself would have been cumulative, since appellants were allowed to testify about the film and Martin's alleged involvement with it. Thus, we do not believe the District Court abused its discretion in excluding the film.

■ Bryant argues that the Court erred in admitting two pieces of evidence from a lawsuit that Showboard had filed in St. Louis Circuit Court. First, the Court admitted a letter Dalton sent to Martin in which Dalton indicated that she needed Martin to verify that Showboard was current with its payments except for miscellaneous payments. Martin sent this verification even though Showboard still owed money for rent. This letter was obviously relevant to prove that a scheme existed between Martin and the appellants, by which they would pay Martin in exchange for improper favors. The District Court's judgment that its relevance is not outweighed by unfair prejudice is reasonable. Second, the Court admitted a Motion for Contempt Citation and Order to Show Cause filed against Showboard in the same lawsuit. Defendants object that this evidence was irrelevant. The motion corroborated Showboard's failure to make timely payment of its bills at the Center, and thus was relevant and properly admitted.

Bryant also charges that the Court erred in preventing Mr. Connelly, a former City Counselor, from testifying that multiple bids were a common practice. In a conference out of the hearing of the jury, Mr. Connelly said he would testify that he was aware of instances where multiple bidding occurred with minority contractors, but he would not say it was an "accepted" practice. We do not think this testimony was

sufficiently probative of the lawfulness or acceptability of multiple bids to require admission, and in any event its exclusion would be harmless error, since the multiple bidding was only a small part of the overall fraudulent scheme.

■ Dalton likewise argues that the Court erred in preventing Mr. Connelly from testifying that other companies received Center lease agreements despite unpaid past bills. Mr. Connelly was allowed to testify at length about the only three instances he remembered in which contracts were issued despite unpaid bills. However, the Court prevented him from testifying that "hundreds" of Center customers other than Showboard were given credits, because the defense had not established the foundation for Connelly's knowledge about this practice. Connelly was able to remember only three specific instances where credit was given and, in addition, his office was not usually involved with the credits. Plainly, the exclusion of this testimony is not an abuse of discretion.

### IV.

In supplemental briefs submitted to this Court, Dalton argues that the trial court erred in allowing her to be represented by the same attorney representing Bryant. She argues that conflicts of interest between herself and Bryant prevented their attorney from giving her full and adequate representation. The government responds that Dalton executed a knowing, voluntary, and intelligent waiver of her Sixth Amendment right to counsel, and thus is foreclosed from challenging the adequacy of dual representation. We agree.

■ As with other constitutional rights, the right to effective assistance of counsel may be waived, provided the waiver is knowing, voluntary, and intelligent. *United States v. Poston*, 727 F.2d 734, 738 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); *United States v. Lawriw*, 568 F.2d 98, 104 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978). In order

for a valid waiver to exist, we require that the trial court question the defendant about his waiver, advise him of the potential danger of dual representation, allow him to ask questions about the dual representation, and place the entire procedure on record. *Lawriw* at 568 F.2d 105. Once a valid waiver is found, it is unnecessary to inquire whether an actual conflict of interest exists. *Poston,* 727 F.2d at 737–38; *Lawriw,* 568 F.2d at 102–05.

■ In this case, the District Court fulfilled its duties to inquire and advise the defendant about dual representation, and we are satisfied that the waiver was knowing, voluntary, and intelligent. On November 4, 1983, the Court held a hearing on appellant's waiver of the right of separate representation. The record of this hearing reveals that Dalton and Bryant made written and oral waivers of separate counsel, and that during the hearing the Court pointed out several areas of possible conflicts, such as conflicting testimony between them, and conflicting interpretations of statements that Martin made at his trial. The Court also advised Dalton she could ask questions about dual representation out of the hearing of anyone else, and she did so on several occasions. On February 2, 1984, just prior to trial, the Court held a second hearing on the record at which it again asked the defendants whether conflicts existed and whether they still desired to have dual representation, and both defendants stated they saw no need for separate representation.

The convictions of the appellants are affirmed.