

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-2006

# USA v. De Los Santos

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3387

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. De Los Santos" (2006). *2006 Decisions.* Paper 882.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/882

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-3387
_____

UNITED STATES OF AMERICA

v.

IGNACIA VERAS DE LOS SANTOS,

Appellant
_____

On Appeal from the District Court of the Virgin Islands
Division of St. Thomas
(D.C. No. 03-cr-00040-1)
District Judge:  Honorable Stanley S. Brotman
_____

Argued May 12, 2006
Before:  FISHER, COWEN and ROTH,[*] *Circuit Judges*.

(Filed June 19, 2006)

Stephen A. Brusch (Argued)
International Plaza, Suite 2G
P.O. Box 988
Charlotte Amalie, St. Thomas
USVI  00804
        *Attorney for Appellant*

_____

[*]The Honorable Jane R. Roth assumed senior status on May 31, 2006.

Kim L. Chisholm (Argued)
Office of United States Attorney
United States Court House, Suite 260
5500 Veterans Building
Charlotte Amalie, St. Thomas
USVI  00802-6924
          *Attorney for Appellee*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

Ignacia Veras de los Santos was convicted by a jury of conspiracy, wire fraud, document fraud, and bribery arising out of her efforts to secure false travel documentation for an illegal alien.  She now appeals, claiming that the evidence was insufficient to support the convictions, that the prosecution charged only one conspiracy but proved two, that her trial should have been severed from those of her codefendants, and that the District Court improperly instructed the jury and impermissibly limited her right to cross-examine witnesses regarding bias.  We will affirm.

I.

A.

The conspiracy in this case, aimed at obtaining false travel documentation for illegal aliens, was manifested in two distinct schemes.  Ms. Veras participated directly in only one, but she was held criminally responsible for both.

2

1.

Jose Agustin Reyes Hilario, a citizen of the Dominican Republic, arrived illegally in St. Thomas, the Virgin Islands, sometime before 2003. He took up residence in the city and began working. But, not pleased with his income and employment prospects, he sought an opportunity to travel to New York City.

That opportunity came in the form of a man who approached Mr. Hilario at work and called himself "Fernando." Mr. Hilario later identified this man as Agustin Veras de los Santos, the brother of Ms. Veras. The two spoke about Mr. Hilario's desire to work in the United States, and Mr. Veras indicated that his sister could help Mr. Hilario to secure authorization for travel and employment within the United States. Mr. Veras told Mr. Hilario that he should meet her at an apartment in St. Thomas.

When Mr. Hilario went to the apartment, Ms. Veras introduced herself as "Racquel." She informed Mr. Hilario that her boyfriend, later identified as Pedro Vega, worked for the immigration service and could "stamp" his passport. The "stamp" to which Ms. Veras referred is an "alien documentation, identification, and telecommunication" stamp, commonly known as an "ADIT" stamp. The Department of Homeland Security uses ADIT stamps as a temporary means to reflect legal immigration status, entitling the bearer to travel and work within the United States.

Ms. Veras advised Mr. Hilario that "the stamp and all this paperwork" would cost $4,000. He agreed, and left his Dominican passport with Ms. Veras. Two weeks later,

3

Ms. Veras called and informed him that the passport was ready. He went to the apartment and was met by Mr. Veras. Mr. Hilario gave Mr. Veras the money, and Mr. Veras gave Mr. Hilario the passport, which now had an ADIT stamp upon it. Mr. Veras told Mr. Hilario that, when he decided to travel, he should call Ms. Veras.

Two weeks after receiving the passport, Mr. Hilario made plans to travel to the United States through San Juan, Puerto Rico. Using a pay phone, he called Ms. Veras. She told him that her boyfriend, Mr. Vega, would help him through customs but needed to know what clothes he would be wearing. Mr. Hilario described his clothing, and Ms. Veras asked him to call her back in a few moments. When he did so, Ms. Veras said that everything had been arranged.

Shortly thereafter, Mr. Hilario went to the airport. Mr. Vega personally checked his passport, took him through the customs process, and allowed him to board his plane. He flew out of St. Thomas without incident.

The landing was not so smooth. Upon arrival in San Juan, he was arrested by agents of the Department of Homeland Security. The reason for the arrest, according to Mr. Hilario, was that "[his] papers were not legal."

2.

Altagracia Ramirez entered the United States illegally in 1999. She was, at some point, apprehended by immigration officials. In late 2003, she agreed to assist them in investigating cases of immigration fraud.

4

Her efforts led officials to Mr. Vega. An acquaintance introduced Ms. Ramirez to a friend of Mr. Vega, who said that Mr. Vega could secure for her an "I-94," a document issued by customs officials reflecting legal immigration status. Ms. Ramirez paid approximately $3,000 for Mr. Vega's services. She was later provided an I-94.

Plans were made for Ms. Ramirez to travel to the United States, under Mr. Vega's auspices. However, the trip was cancelled after Mr. Vega became concerned over a possible investigation by immigration officials. His fears proved well-founded: he was arrested soon thereafter.

### B.

An indictment against Ms. Veras, Mr. Veras, and Mr. Vega was filed in the District Court of the Virgin Islands. It charged them with conspiracy in violation of 18 U.S.C. § 371, wire fraud in violation of 18 U.S.C. § 1343, document fraud in violation of 18 U.S.C. § 1546, and bribery in violation of 18 U.S.C. § 201.

Trial commenced on August 24, 2004.[1] Before the start of testimony, Ms. Veras moved to sever her case from those of her codefendants. She argued that she would be prejudiced by introduction of a prior statement by Mr. Veras in which he had implicated both himself and his sister in the scheme to procure a false ADIT stamp. The District Court denied the motion, holding that redaction of the statement to eliminate all references to a coconspirator would ameliorate any potential prejudice to Ms. Veras.

---

[1]A previous trial had produced a hung jury, and ended in mistrial.

The first witness for the government was Mr. Hilario. He admitted that he had entered the Virgin Islands illegally and recounted his encounters with Mr. Veras and Ms. Veras, whom he identified as "Fernando" and "Racquel." He also confirmed that he had paid $4,000 for the ADIT stamp and that Mr. Vega had personally assisted him through the customs process.

Defense counsel attempted to question Mr. Hilario regarding payments he had received as a witness for the government. The District Court intervened, on objection by the prosecution, and precluded counsel from this line of inquiry. It instructed the jury that, because these payments were authorized by statute, they could not be considered as evidence of bias or motive.

The next witness was Mr. Hilario's mother. She testified that she had provided the $4,000 for her son to obtain the ADIT stamp. She also recalled that after the arrest Ms. Veras, accompanied by Mr. Vega, had visited her and returned approximately $1,500.

The prosecution then introduced into evidence, through a government agent, a statement taken from Ms. Veras shortly after her arrest. She admitted in the statement that she was generally known as "Racquel," that she was Mr. Vega's girlfriend, and that she had helped "two guys" – one of whom was named "Fernando" – to "get work authorizations." However, she indicated that she had "no knowledge that [Mr.] Vega has been or is doing anything having to do with immigration documents."

6

The government also introduced a redacted version of the statement taken from

Mr. Veras shortly after his arrest.  In the original statement, Mr. Veras admitted that he

had participated in the scheme to secure a false ADIT stamp and had operated under the

direction of Ms. Veras.  The statement was redacted to eliminate all references to Ms.

Veras.[2]  The District Court admitted the redacted statement and instructed the jury to

_____

[2]The alterations between the original and redacted statements are diagramed
below:

| Original Statement | Redacted Statement |
|---|---|
| Q: Is that address under your name? | DELETED |
| A: Under my sister, Ignacia Veras de los Santos. | |

| Original Statement | Redacted Statement |
|---|---|
| Q: Do you know if there are any passports in your apartment, which do not belong to anyone residing in the apartment? | SAME |
| A: Yes. | |

| Original Statement | Redacted Statement |
|---|---|
| Q: To whom do these passports belong? | DELETED |
| A: They belong to the people who left them with my sister Ignacia. | |

| Original Statement | Redacted Statement |
|---|---|
| Q: To whom did you give the money that Fernando gave you? | Q: What did you do with that money? |
| A: To my sister Hignacia (sic). | A: The next day, I passed it as instructed. |
| Q: When did your sister Ignacia come for the money? | |
| A: The following day. | |

7

consider it "as [Mr. Veras's] statement, and not the statement of anyone else, or attributed to anyone else who is on trial."

The government also presented several telephone company employees, who testified regarding calls made by and to Mr. Vega and Ms. Veras allegedly in furtherance of the scheme. These calls were routed across territorial boundaries, outside the borders of the Virgin Islands.

At the conclusion of testimony, defense counsel moved for judgment of acquittal, arguing that the government had not satisfied its evidentiary burden. In particular, counsel pointed out that none of the government witnesses had testified that the ADIT stamp on Mr. Hilario's passport was fraudulent. The District Court reserved decision on the motion.

Counsel proceeded with closing arguments, and the jury was charged. The District Court specifically instructed the jury to consider the charges and the evidence against each defendant individually.

The jury returned a verdict of guilty on all counts on September 8, 2004.

---

| Original Statement | Redacted Statement |
|---|---|
| Q: What did [the person] tell you [when he brought money for a second time]? | Q: What did [the person] tell you [when he brought money for a second time]? |
| A: He told me "I am bringing this money so that you can give it to Raquel." | A: He asked me to give the money as before. |

*See United States v. Veras de los Santos*, 163 Fed. Appx. 132, 134 (3d Cir. 2006).

8

## C.

Following trial, the District Court took up the motion for judgment of acquittal. Defense counsel argued that the prosecution had not presented sufficient evidence to support the convictions and that, even if it had, it had impermissibly proven two separate conspiracies – one involving the procurement of the ADIT stamp and the other involving the procurement of the I-94 – when the indictment alleged only one. Counsel also asserted that the prosecution had not proven wire fraud because "it was not reasonably foreseeable that [the defendants' phone calls] would cross the territorial boundary." Finally, counsel renewed the contention that Ms. Veras's case should have been severed from those of her codefendants.

The District Court denied the motion. It concluded that the jury could have reasonably inferred that the ADIT stamp was fraudulent from "the manner in which the . . . stamp was acquired," the circumstances surrounding Mr. Hilario's arrest, and "[Ms.] Ramirez's testimony." It rejected the argument that the prosecution was required to prove that the defendants could "reasonably foresee" that their telephone calls would be routed out of the territory, and held that severance was unnecessary because redaction of Mr. Veras's statement had ameliorated any prejudice to Ms. Veras.

Ms. Veras was subsequently sentenced to a term of imprisonment of twenty-eight months. This timely appeal followed.[3]

## II.

Ms. Veras raises several challenges to the judgment of conviction. Foremost, she argues that the evidence was insufficient to establish the elements of the crimes with which she was charged. She also argues that the prosecution created an impermissible variance by proving two conspiracies when only one was alleged in the indictment, that her case should have been severed from those involving her codefendants, that the jury should have been instructed that it must consider the charges against each defendant individually, and that the District Court improperly limited defense counsel's right to cross-examine witnesses regarding bias. These issues will be addressed in turn.

## A.

It is axiomatic that a conviction must be supported by sufficient evidence. *See, e.g.*, *Burks v. United States*, 437 U.S. 1, 16-17 (1978). The record, considered in the light most favorable to the government, must provide an adequate basis for a rational juror to conclude that the defendant committed each and every element of the charged crimes. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). This is, of course, a rather

---

[3]Separate appeals were filed by Mr. Veras and Mr. Vega. The judgment against Mr. Veras was affirmed in *United States v. Veras de los Santos*, 163 Fed. Appx. 132 (3d Cir. 2006), and the judgment against Mr. Vega is addressed in a separate opinion by this panel, *see United States v. Vega*, No. 05-2389 (3d Cir. 2006).

minimal burden. *Id.* Only if a conviction is objectively irrational – plainly based on speculation rather than rationalization and necessarily ignoring the presence of reasonable doubt as to guilt – should the court overturn the verdict. *E.g.*, *United States v. Cartwright*, 359 F.3d 281, 287-88 (3d Cir. 2004).

Ms. Veras was charged with four crimes: conspiracy, wire fraud, document fraud, and bribery. She was convicted of all offenses, and now challenges the sufficiency of the record as to each.

1.

A criminal conspiracy, in violation of 18 U.S.C. § 371, is established by proof that "two or more persons conspire[d] . . . to commit any offense against the United States . . . and [that] one or more of such persons d[id] any act to effect the object of the conspiracy." *Id.* We have interpreted this provision to encompass three elements: (1) an agreement between two or more persons to commit a federal crime, (2) knowledge of the purpose of the conspiracy and a deliberate decision to join in that purpose, and (3) commission of an "overt act" by one of the participants in furtherance of the conspiracy. *United States v. Conley*, 37 F.3d 970, 976-77 (3d Cir. 1994).

These elements are satisfied in this case. There is no doubt, based on a view of the evidence in a light favorable to the government, that the three defendants were engaged in an arrangement to provide Mr. Hilario with an ADIT stamp. Mr. Veras approached Mr. Hilario, an alien who had entered the Virgin Islands illegally, to determine whether he

11

would be willing to pay for an ADIT stamp. He placed Mr. Hilario in contact with Ms. Veras, who arranged for an exchange of the passport and the money. The passport was forwarded to Mr. Vega, who affixed the ADIT stamp, and was returned to Mr. Veras, who retained it until claimed. Mr. Hilario then scheduled a time to leave St. Thomas, and was shepherded through the customs process by Mr. Vega.

Despite the lack of direct evidence on the point, the circumstances surrounding this scheme give rise to an inference that the participants understood that the ADIT stamp was fraudulent. *See Brodie*, 403 F.3d at 134 ("The elements of conspiracy . . . can be proven entirely by circumstantial evidence."). The transaction took place at a private residence, outside normal channels. It involved an alien who was in the country illegally, and subject to deportation. It was conducted for a large sum of money, paid in cash. It required the involvement of a government official, who intervened to provide the alien with facially valid documentation and uninterrupted passage through the customs process. A reasonable juror could infer from these circumstances that the conspirators were aware that the product of their efforts, the ADIT stamp, was fraudulent. *See id.* ("[W]e do not view the government's evidence in isolation, but rather, in conjunction and as a whole."); *see also United States v. Ytem*, 255 F.3d 394, 396-97 (7th Cir. 2001).

The primary case cited by defense counsel in support of acquittal, *United States v. Cartwright*, 359 F.3d 281 (3d Cir. 2004), is factually inapposite. *Cartwright* followed a line of precedent holding that knowledge of criminal activity is insufficient to support a

12

conviction of conspiracy if the defendant did not understand the particular nature of the criminal activity. *Id.* at 286-87.[4] This case is markedly different. The defendants worked together to achieve a known, common end: obtain an ADIT stamp for an illegal alien. They were all aware of the objective of the conspiracy and took actions toward that goal. Unlike *Cartwright*, where the record demonstrated knowledge only of "some sort" of illegality, *see id.*, the record in this case supports an inference that the defendants knew of the particular unlawful end of the conspiracy.

The evidence presented at trial was sufficient to prove that the defendants knowingly entered into an agreement to provide Mr. Hilario with a fraudulent ADIT stamp and took affirmative steps to achieve this goal. The conspiracy conviction will be upheld.

2.

Wire fraud is defined under 18 U.S.C. § 1343 as the use of interstate communications in furtherance of a "scheme or artifice to defraud." *Id.* To sustain a conviction under the statute, the record must show that the defendant (1) knowingly and willfully participated in a scheme or artifice to defraud, (2) possessed a specific intent to defraud, and (3) used wire communications in interstate commerce, or reasonably foresaw

---

[4]*See also United States v. Mastrangelo*, 172 F.3d 288, 293 (3d Cir. 1999); *United States v. Idowu*, 157 F.3d 265, 266-67 (3d Cir. 1998); *United States v. Thomas*, 114 F.3d 403, 405 (3d Cir. 1997); *United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991); *United States v. Wexler*, 838 F.2d 88, 90-92 (3d Cir. 1988); *United States v. Cooper*, 567 F.2d 252, 254-55 (3d Cir. 1977).

13

that such wires would be used, in furtherance of the scheme. *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001).

For the same reasons that the record demonstrates a conspiracy to secure a fraudulent ADIT stamp, the record demonstrates a scheme to defraud the public. The defendants sought to provide an illegal alien with a fraudulent ADIT stamp in exchange for payment. The stamp was obtained through the auspices of a United States customs official, Mr. Vega, who was responsible for enforcing the immigration laws and preventing issuance of invalid stamps. To achieve the goal of the scheme, Mr. Vega was required to disregard these mandates and provide an ADIT stamp to an alien who was not authorized to travel in the country. Because this action deprived the public of its "intangible right of honest services," *see* 18 U.S.C. § 1346, the conspiracy constituted a "scheme or artifice to defraud." *See id.*

The only other element in dispute is whether the scheme involved the use of "wire . . . communication in interstate . . . commerce." *Id.* § 1343. Defense counsel argues that this element requires proof not only that the defendant used wire communications in furtherance of the scheme, but also that he or she could "reasonably foresee" that those communications would travel interstate.

We disagree. The question is, at its essence, one of statutory interpretation. The statute provides, in pertinent part, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire, radio,

14

> or television communication in interstate or foreign commerce, any . . .
> signals . . . or sounds for the purpose of executing such scheme or artifice,
> shall be [guilty of wire fraud].

*Id.* This provision does not, by its own terms, require that the defendant "reasonably foresee" that the communications would cross territorial boundaries. Such a "scienter" requirement should thus be imposed only if one may be read into the statute.

The Supreme Court has, in fact, stated that a scienter requirement should generally be read into a criminal statute even absent express statutory support. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70-71 (1994) (citing *Staples v. United States*, 511 U.S. 600 (1994); *Morissette v. United States*, 342 U.S. 246 (1952)). This principle is based on the presumption that Congress intends to punish only culpable conduct, committed by an individual who consciously engages in criminal behavior. *See Morissette*, 342 U.S. at 261-63.

This presumption does not apply, however, to "jurisdictional facts." *X-Citement Video*, 513 U.S. at 72 n.3 (citing *United States v. Feola*, 420 U.S. 671 (1975)). These facts do not define improper or culpable behavior, but exist merely to confer jurisdiction over certain offenses in the federal courts. *Feola*, 420 U.S. at 676 n.9. Since they are irrelevant to the culpability of the offender, there is no basis to apply the presumption of a scienter requirement. *See X-Citement Video*, 513 U.S. at 70-72 & n.3.

The interstate element of 18 U.S.C. § 1343 is properly deemed a "jurisdictional fact." Although the legislative history of the provision is sparse at best, it seems plain

15

that the interstate element was included simply to ensure that federal courts would have jurisdiction over these offenses under the Commerce Clause. *See, e.g., United States v. Bryant*, 766 F.2d 370, 375 (8th Cir. 1985). A fraud is no less culpable when it is committed over intrastate – as opposed to interstate – wires, and there is no indication that Congress was particularly concerned with the effect of interstate – as opposed to intrastate – transmissions when it enacted the statute. *Id.* The only plausible reason for Congress to have included this element was to confer jurisdiction on the federal courts. Thus, the presumption of a scienter requirement does not apply. *Id.*

This holding accords with the conclusions reached by other courts that have considered the issue. *See United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000), *overruled on other grounds by United States v. Longoria*, 298 F.3d 367, 372 n.6 (5th Cir. 2002); *United States v. Lindemann*, 85 F.3d 1232, 1241 (7th Cir. 1996); *United States v. Blackmon*, 839 F.2d 900, 907 (2d Cir. 1988); *Bryant*, 766 F.2d at 375; *United States v. Blassingame*, 427 F.2d 329, 330 (2d Cir. 1970), *cited with approval in United States v. Iannelli*, 477 F.2d 999, 1002 (3d Cir. 1973), *and United States v. De Cavalcante*, 440 F.2d 1264, 1268 n.3 (3d Cir. 1971). Only the Court of Appeals for the Fifth Circuit has held to the contrary, *see United States v. Brumley*, 59 F.3d 517, 520 & n.5 (5th Cir. 1995),

16

but that opinion was subsequently vacated, *see* 91 F.3d 676 (5th Cir. 1996), and has since

been ignored in favor of the majority view, *see Richards*, 204 F.3d at 207.[5]

Mr. Hilario testified that Ms. Veras called him and Mr. Vega on at least two

occasions to arrange for transfer of the passport and travel out of St. Thomas.  A

representative of the phone company confirmed that these calls were routed outside of the

territorial borders of the Virgin Islands, through Puerto Rico.  *See* 18 U.S.C. § 10 ("The

term 'interstate commerce', as used in this title, includes commerce between one State,

Territory, Possession, or the District of Columbia and another State, Territory, Possession,

or the District of Columbia.").  This evidence demonstrates use of wire communications

in interstate commerce in furtherance of a scheme to defraud.  The conviction under 18

U.S.C. § 1343 will be upheld.

---

[5]Defense counsel cites *Bentz v. United States*, 21 F.3d 37 (3d Cir. 1994), as stating a contrary rule.  It does not.  We held in *Bentz* that, to support a finding that the defendant "caused" a wire communication under 18 U.S.C. § 1343, the prosecution must demonstrate at least that the defendant should "reasonably [have] foreseen" the occurrence of a wire communication in furtherance of the scheme to defraud.  21 F.3d at 40 (quoting *Pereira v. United States*, 347 U.S. 1, 9 (1954)).  We then concluded that the record did not support a finding of reasonable foreseeability, and reversed the conviction. *Id.* at 40-42.  Our discussion in *Bentz*, like those in the other cases cited by defense counsel, *see*, *e.g.*, *United States v. Hasson*, 333 F.3d 1264, 1272 (11th Cir. 2003), *cert. denied*, 543 U.S. 1173 (2005); *United States v. Goodson*, 155 F.3d 963, 966 (8th Cir. 1998), does not address the question here:  whether the interstate nature of the wire communication must be reasonably foreseeable.

3.

Production or possession of fraudulent immigration papers is defined as a federal offense under 18 U.S.C. § 1546. That section provides that "[w]hoever knowingly forges, counterfeits, alters, or falsely makes any . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or . . . possesses . . . any such . . . document[,] . . . knowing it to be . . . procured by fraud or unlawfully obtained," is guilty of a crime. *Id.* § 1546(a).

Neither party disagrees that a passport with an ADIT stamp is a "document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States." Nor is there any doubt that Ms. Veras "possessed" the document, for these purposes. The sole question is whether the government presented adequate proof that the ADIT stamp was fraudulent.

The record is sufficient in this regard. Although the government presented no direct evidence that the stamp was invalid, it did offer a quantum of circumstantial proof. *See United States v. Singh*, 222 F.3d 6, 9-10 (1st Cir. 2000) (noting that circumstantial evidence may suffice to demonstrate forgery). The stamp was obtained under extremely suspicious circumstances, outside official channels and for a large sum of cash. It was provided to an alien who had entered the country illegally. The defendants did not ask Mr. Hilario for background information or have him submit a formal application, something that would normally be expected in these circumstances. The stamp was

18

affixed to the passport outside of his presence, and the document was returned to someone who was neither related to him nor affiliated with immigration services. He was instructed to depart the territory at a particular time, wearing particular clothes, and in the presence of a particular official, Mr. Vega.[6] He was allowed to board the plane with Mr. Vega's intervention, but was not allowed to travel elsewhere in the United States using the passport. And, soon after Mr. Hilario was arrested, Ms. Veras and Mr. Vega spoke personally with Mr. Hilario's mother – in a private setting – and returned a substantial portion of the fee that they had taken.

These circumstances, and the inferences flowing therefrom, could convince a reasonable juror that the ADIT stamp on Mr. Hilario's passport was fraudulent. The conviction under 18 U.S.C. § 1546 will be upheld.

4.

Federal law prohibits the giving or accepting of money to influence official actions. A "public official" commits the offense of bribery under 18 U.S.C. § 201(b) when he or she "corruptly . . . accepts . . . anything of value personally or for any other person . . . in return for . . . being influenced in the performance of any official act[,] . . . being influenced to commit or aid in committing . . . any fraud . . . on the United States[,]

---

[6]This is particularly suspicious in light of testimony from other immigration officers that Mr. Vega was only rarely involved in the actual processing of travelers.

19

or . . . being induced to do or omit to do any act in violation of the official duty of such official." *Id.*

Defense counsel does not disagree, based on a view of the evidence in a light favorable to the government, that Mr. Vega is a "public official" within the meaning of the statute and that he accepted money to affix an ADIT stamp to Mr. Hilario's passport. Rather, counsel argues again that the evidence is insufficient to establish that Mr. Hilario "was ineligible for [the stamp]."

This argument fails for the reasons previously discussed. The record supports a finding that Mr. Hilario, as an alien who had entered the country illegally, was not entitled to an ADIT stamp and that Mr. Vega fraudulently affixed the stamp to the passport. This act, and allowing Mr. Hilario to pass through the customs process with an invalid ADIT stamp, constituted a violation of Mr. Vega's official duty, sufficient to sustain a conviction for bribery. *See* 18 U.S.C. § 201(b)(2)(C).

Ms. Veras knowingly aided and abetted Mr. Vega in this scheme. She is therefore criminally liable for bribery. *See* 18 U.S.C. § 2(a); *see also United States v. Dixon*, 658 F.2d 181, 189 (3d Cir. 1981) (finding sufficient evidence to support conviction for aiding and abetting bribery). The conviction under 18 U.S.C. § 201(b)(2) will be sustained.

B.

Ms. Veras next argues that the government created an impermissible "variance" by proving two conspiracies when only one was alleged. The prosecution is not permitted to

20

allege a single conspiracy in an indictment and then offer evidence of multiple, independently operating conspiracies at trial. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002). Such a variance between the pleadings and the proof betrays a misjoinder of defendants and carries the possibility that an individual who is not involved in the larger scheme will nevertheless be convicted thereof. *Kotteakos*, 328 U.S. at 765-74, *cited in United States v. Lane*, 474 U.S. 438, 446-47 (1986).

We need not determine whether there was a variance in this case because, even if established, it did not impact Ms. Veras. A variance will prove fatal to conviction only if it causes substantial prejudice to the defendant. *United States v. Padilla*, 982 F.2d 110, 114-16 (3d Cir. 1992). This prejudice most often arises by the "spillover" effect of evidence of one defendant's guilt to another defendant who was not involved in the same conspiracy. *E.g.*, *United States v. Camiel*, 689 F.2d 31, 37 (3d Cir. 1982); *see also Kotteakos*, 328 U.S. at 774 (warning of "[t]he dangers of transference of guilt from one to another across the line separating conspiracies").

There was little chance of such spillover in this case. The only evidence that would have been introduced as a result of the alleged variance pertained to the scheme to secure a fraudulent I-94. Ms. Veras was not involved in this plot and apparently had no knowledge of it. None of the witnesses linked Ms. Veras to the scheme or suggested that she should be held accountable for it. And, in light of the relatively substantial evidence

21

of Ms. Veras's participation in the scheme to provide a false ADIT stamp to Mr. Hilario, it is quite unlikely that the jury would have relied on evidence relating to the I-94 scheme to convict her of conspiracy.

The purported variance did not substantially prejudice Ms. Veras. It thus does not provide a basis to overturn the judgment of conviction.

C.

Ms. Veras also contends that the District Court erred in denying her motion for severance. She argues specifically that introduction of Mr. Veras's statement, even in its redacted form, infringed on her rights under the Confrontation Clause.

Severance should generally be granted if the defendant would be prejudiced by introduction of an inculpatory prior statement of a codefendant. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also United States v. Balter*, 91 F.3d 427, 433 (3d Cir. 1996). Such a statement is admissible against the codefendant as a party admission, but it is not admissible against the defendant because he or she has enjoyed no opportunity to cross-examine the speaker. *Zafiro*, 506 U.S. at 539 (citing *Bruton v. United States*, 391 U.S. 123 (1968)). Introduction of the statement against the defendant would violate his or her rights under the Confrontation Clause. *Bruton*, 391 U.S. at 135-36.

But severance is not required if the prejudice to the defendant can be successfully ameliorated. This is most often accomplished, under the line of cases following *Bruton v. United States*, 391 U.S. 123 (1968), by redacting the statement to eliminate all references

22

to a coconspirator and by issuing a limiting instruction advising the jury that it may not consider the statement as evidence against the defendant. *See, e.g., Richardson v. Marsh*, 481 U.S. 200, 206-08 (1987). Redaction eliminates any direct implication of guilt against the defendant, and the cautionary instruction ensures that the jury will not draw a contextual inference of guilt. *Id.* This cures any prejudice arising from introduction of the statement, obviating the need for severance. *See Zafiro*, 506 U.S. at 539; *see also United States v. Quintero*, 38 F.3d 1317, 1341 (3d Cir. 1994).

The redaction in this case satisfied *Bruton*. The revised statement eliminated all references to the existence of a coconspirator.[7] It suggests obliquely that Mr. Veras transferred money from Mr. Hilario to another person, but it does not imply that the other person was involved in the conspiracy or was a participant in the illegal activity. The statement thus provides no basis on which a juror might draw a direct implication of guilt against Ms. Veras. *See Gray v. Maryland*, 523 U.S. 185, 188-89, 192-97 (1998); *Richardson*, 481 U.S. 208-11.

Any residual risk of contextual implication of guilt was obviated by the District Court's limiting instruction. The District Court directed the jury that it must consider Mr. Veras's admission "as his statement, and not the statement of anyone else, or attributed to anyone else who is on trial." (A. 1379-80.) This instruction, given at defense counsel's

---

[7]*See supra* note 1 (diagraming alterations).

request, adequately informed the jury that it must not consider Mr. Veras's statement as evidence against Ms. Veras. *See Richardson*, 481 U.S. 206-08.

Redaction of the statement and issuance of the limiting instruction ameliorated any prejudice that Ms. Veras might have suffered as a result of the joint trial. The District Court therefore acted within its discretion in denying the motion to sever. *See*, *e.g.*, *Zafiro*, 506 U.S. at 539.

### D.

Ms. Veras next asserts that the District Court failed to inform the jury that, notwithstanding the joinder of the defendants for trial, the prosecution still bears the burden of proving the charges against each defendant individually. *See*, *e.g.*, *Lane*, 474 U.S. at 450 n.13. This claim is meritless. In both the preliminary and final instructions, the District Court advised the jury that, although the defendants were being tried as a group, "[i]t is [the jury's] duty to give separate, personal, consideration to the case of each individual defendant," analyzing only the evidence admitted against that defendant and excluding evidence "admitted solely against some other defendant or defendants." (A. 178, 1984-85.) These instructions properly advised the jury to give independent consideration to the charges against each defendant.[8]

---

[8]In a related vein, Ms. Veras also argues that she was prejudiced by the introduction of evidence relating to the obstruction-of-justice charge against Mr. Vega. Again, this claim is meritless. The defendants were properly joined for purposes of trial, and the jury was properly instructed that, in resolving the charges against one defendant, it should not consider the charges against others. In light of this instruction, which the

24

E.

Finally, Ms. Veras complains that the District Court impermissibly limited her right to cross-examine Mr. Hilario regarding payments he had received from the government pending his testimony in this case. *See*, *e.g.*, 28 U.S.C. §§ 530C(b)(3), 1821 (providing for payments to witnesses).[9] The District Court reasoned that, because a statute provides for these payments, they cannot be used to demonstrate bias on the part of the witness. It instructed the jury:

> [The] United States Congress has passed a statute that allows the payment for lodging, food, transportation, so long as he's a material witness. It's the law. And the funds are paid by the Marshal's Service. Now, nothing improper can be inferred from that process, because it's the process the person is allowed to follow.

(A. 454.)

We need not decide whether this instruction infringed on Ms. Veras's constitutional right of confrontation because, even if in error, it did not affect the verdict. The proposed cross-examination was not intended to rebut any aspect of the case against Ms. Veras or to establish a defense to the charges. Rather, it was intended merely to demonstrate that Mr. Hilario was a "friendly witness," predisposed toward the government.

---

jury is presumed to have followed, *see*, *e.g.*, *Lane*, 474 U.S. at 450 n.13, it is clear that Ms. Veras was not prejudiced by the introduction of evidence relating to the obstruction-of-justice charge.

[9]It is not clear from the record under which statute the payments to Mr. Hilario were authorized.

25

This fact would have already been clear to the jury. Mr. Hilario was called as a government witness. He admitted during his testimony that he was cooperating with law enforcement and had discussed the case with government counsel. Moreover, the jury was informed, by counsel and the District Court, that Mr. Hilario was receiving payments from the government pending his testimony. The jury was well aware of Mr. Hilario's affiliation with the government and his possible bias. The instruction by the District Court would not have affected its assessment of his credibility.

The limitation on defense counsel's cross-examination, if error, was harmless beyond a reasonable doubt. *See United States v. Chandler*, 326 F.3d 210, 222-23 (3d Cir. 2003) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). The judgment of conviction will not be overturned on this ground.

### III.

The record in this case supports the finding that Ms. Veras engaged in a conspiracy to provide a fraudulent passport stamp for an illegal alien. The District Court did not abuse its discretion in refusing to sever her trial from those of her coconspirators and properly instructed the jury on its obligation to consider the evidence against each defendant individually. Any error in limiting defense counsel's right of cross-examination is, in light of the substantial evidence against Ms. Veras, properly considered harmless.

The judgment of the District Court will be affirmed.